# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES W. MILLNER,

  Petitioner,

  v.

SCOTT FRAUENHEIM,

  Respondent.

No.  2:19-CV-01311-JAM-DMC-P

FINDINGS AND RECOMMENDATIONS

Petitioner, a state prisoner proceeding with retained counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, Respondent's answer, ECF No. 32, and Petitioner's traverse, ECF No. 33.  Respondent has lodged the state court record, ECF No. 31.

Petitioner asserts three claims: (1) the state knowingly presented false evidence at his trial; (2) the state violated Maryland v. Brady[1] when it failed to provide him with exculpatory evidence; and (3) the trial court improperly denied his Trombetta/Youngblood[2] motion.  The most recent reasoned decision on the matter is from the state Superior Court.  Having reviewed the petition and the record, the undersigned recommends that Petitioner's petition be denied.

/ / /

---

[1] 373 U.S. 83 (1963).
[2] 467 U.S. 479 (1984); 109 S. Ct. 333 (1988).

## I. PROCEDURAL BACKGROUND

In 2007, Petitioner Millner was convicted by a jury of second-degree murder for the killing of his wife and attempted murder of his son Adam. ECF No. 1-1at 12. He challenged his convictions by direct appeal to the California Court of Appeal. Id. at 12-13. That court affirmed his convictions but remanded the matter for resentencing. Id. at 13. The California Supreme Court denied his petition for review. Id. Several years later, Petitioner filed a writ of habeas corpus with the Shasta County Superior Court. Id. at 8-10. The court denied the petition in 2018, which is the latest reasoned decision on the merits. Id. Petitioner subsequently filed a writ with the California Court of Appeal and the California Supreme Court, both of which issued silent denials of his requested habeas relief. See ECF No. 1 at 12-17. Having fully exhausted his remedies, Petitioner now bring this action in federal court.

## II. FACTUAL BACKGROUND

On January 6, 2006, Petitioner was at home with his wife Ila, their son Adam, their older son, and Adam's friend. Adam was sixteen years old at the time. Adam testified to the following: in the early hours of January 6, he was in his room with his friend when he heard screams come from his parents' bedroom. ECF No. 26-4 at 3. He went to their bedroom and saw Petitioner (his father) on top of his mother with his hand over her mouth. Id. at 15. Adam pulled Petitioner off his mother and saw a gun in Petitioner's hand. Id. at 16. Petitioner shot Adam in the abdomen and fatally shot Ila several times. Id. at 21. Dr. Comfort, forensic pathologist, testified that the Ila was shot once in the face, twice in her torso, once in her arm, and once below her rib cage. ECF No. 18-5 at 528-530.

At trial, Petitioner argued he acted in self-defense, claiming that his wife pulled a gun on him. Petitioner did not testify at trial, but his interviews with the police were admitted into evidence. ECF No. 18-2 at 131. During the interview he stated that he and his wife were arguing in their bedroom when she pulled a gun on him. Id. at 151. He stated that she hit him in the face with it, causing a struggle for the gun. Id. at 203-04. He took possession of the gun and pulled the trigger, shooting her. ECF No. 18-2 at 191, 198, 226, 228. He did not remember if the

gun was cocked when he took it from his wife but said that he did not cock it. Id. at 158.

Part of the prosecution's theory was the victim was not strong enough to cock the gun (because she recently had surgery on her dominate shoulder and the gun was difficult to cock).[3] To demonstrate that it would have been difficult for the victim to cock the gun, the jurors were allowed to try to cock it themselves, with most of the female jurors being unable to do so. In closing, the state argued that the victim did not cock the gun. The relevant portion of the state's closing follows:

> First of all, she would have to pull it out with her left hand, and he said she pulled it out with her left hand. We know she is right-handed, and she just had her right shoulder operated on, so she is pulling this gun out from somewhere behind the bed with her right hand, according to him. She has got to pull it out and swing it hard enough across her body from a prone position to hit him hard enough in the head to cut his head, and then somewhere during that time she had to cock this gun because the defendant never admitted cocking it. Who do you think cocked this gun? That's why I wanted you all to try the action to this gun, see how hard it was to cock and to see what the trigger pull was like. And again, not to be sexist, but I couldn't help notice that a lot of the female jurors couldn't even cock that gun. You all tried it. You all saw how hard it is. Think about doing it with your weak hand and think about doing it lying down and swinging this gun up over your head and around hard enough to hit the defendant to cut him in the head and then be able to cock it.
> You know what, it didn't happen that way. She couldn't have done that. His first story is probably more accurate. Maybe she did have the gun and he grabbed it and he got cut trying to take it away from her; or even more likely, he had the gun, she was fighting for her life. He was pointing it at her, and she was grabbing it and going back and forth and the hammer here or the rear sight hit him in the eyebrow.

ECF No. 18-7 at 178-79.

By April 2017, Adam had not spoken with Petitioner for several years. Thereafter, the two slowly started to communicate and eventually discussed Petitioner's trial. Adam told Petitioner that Adam was interviewed by either the District Attorney or an investigator before the trial. ECF No. 1-1 at 4-6. Adam told the interviewer that he had used the gun the previous day—January 5, and that he loaded and cocked the gun when he returned it to his parents' bedroom. Id. at 5-6. Adam then learned from Petitioner that the state "misrepresented the facts" that he told

---

[3] The weapon was a Browning Hi-Power nine-millimeter pistol with a six to six and half pound trigger pull. Once the weapon was cocked, it did not need to be re-cocked after a shot was fired.

3

the interviewer regarding the gun.[4] Id. at 6.

This newly discovered evidence—that the gun was last seen by Adam loaded and cocked, and the district attorney's failure to disclose Adam's interview, support two of Petitioner's claims: a Brady violation and the discovery of new evidence. Petitioner's final claim also relates to the gun—that the trial court wrongfully denied his Trombetta/Youngblood motion.

### III.  STATE COURT DETERMINATION

Petitioner filed a writ of habeas corpus in the Shasta County Superior Court on November 13, 2017, which the court denied on April 3, 2018. ECF No. 1 at 8-10. There, Petitioner argued that new and false evidence required the reversal of his conviction under California Penal Code Section 1473. Id. at 8. Petitioner alleged that the new evidence was that Adam loaded and cocked the gun before the incident, discussed supra, and the false evidence was the state's argument and theory that the victim was not strong enough to cock the gun. Id. Petitioner also argued that the denial of his Trombetta/Youngblood motion required the reversal of his conviction. Id.

The Superior Court evaluated each of Petitioner's claims and found that whether the evidence was new or false, he failed to establish a prima facie case that would entitle him to any relief. Id. It noted that Adam's declaration was "untimely, vague, and immaterial" and that Adam was subject to cross examination at trial. That Court found that even assuming Adam's declaration was true, it still would have no probative significance to Petitioner's guilt or punishment. Further, it found that Petitioner failed to establish that the new evidence would more likely than not have changed the trial's outcome. "The fact that the murder weapon was used by the son earlier in the day is not sufficient evidence, being offered nearly twelve (12) years later that the murder weapon was in a certain condition later that evening, that would even remotely suggest the outcome of Petitioner's trial would have been any different." Id. With regards to Petitioner's claim of false evidence, the Superior Court found that the evidence presented at trial

---

[4] Because Adam was a victim, he was only in court for his testimony and did not hear other witness testify or the state's arguments.

was that Petitioner admitting he did not cock the gun and that the victim would have had a difficult time cocking it—none of which was false or refuted by Adam's declaration. As for the Trombetta/Youngblood motion, it found that Adam's testimony established the crime, and the potentially excluded evidence would not have affected the outcome of the trial.

## IV. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

1 of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine

6

1    first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040, 1052 n.6
2    (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal
3    habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the
4    error had a substantial and injurious effect on the verdict, or was harmless.  See id.
5           State court decisions are reviewed under the far more deferential "unreasonable
6    application of" standard where it identifies the correct legal rule from Supreme Court cases, but
7    unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.
8    510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested
9    that federal habeas relief may be available under this standard where the state court either
10   unreasonably extends a legal principle to a new context where it should not apply, or
11   unreasonably refuses to extend that principle to a new context where it should apply.  See
12   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court
13   decision is not an "unreasonable application of" controlling law simply because it is an erroneous
14   or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,
15   75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even
16   where the federal habeas court concludes that the state court decision is clearly erroneous.  See
17   Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper
18   deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.
19   As with state court decisions which are "contrary to" established federal law, where a state court
20   decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless
21   unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.
22   / / /
23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

## V. DISCUSSION

As stated above, Petitioner contends his federal constitutional rights were violated because the state presented false evidence at his trial and failed to disclose exculpatory evidence, and because the trial court improperly denied his Trombetta/Youngblood motion. See ECF No. 1. Respondent contends Petitioner is not entitled to relief on the merits because the state court's determination was neither contrary to nor based on an unreasonable application of clearly established federal law. See id. at 17-21.

### A. *Brady* Violation

Under Brady and its successors, a state can violate a criminal defendant's due process rights by failing to disclose evidence that is material to the defendant's guilt or punishment. See Cone v. Bell, 556 U.S. 449, 451 (2009); Brady, 373 U.S. at 87; Browning v. Baker, 875 F.3d 444, 459 (9th Cir. 2017). A criminal defendant claiming a Brady violation must show: (1) the evidence at issue is favorable to him either because it is exculpatory or impeaching; (2) the government suppressed the evidence, either willfully or inadvertently; and (3) the defendant suffered prejudice. See Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Here, Petitioner cannot demonstrate, and a reasonable jury could not conclude, that he suffered prejudice as a result of this evidence. To show prejudice or materiality, the petitioner must show a "reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281. A reasonable probability does not require the petitioner to show that he "would more likely than not have received a different verdict with the evidence," but only that the likelihood of a different result is great enough to 'undermine' the court's "confidence in the outcome of the trial." See Smith v. Cain, 565 U.S. 73, 75 (2012).

First, Adam's declaration does not state, nor does any other declaration, that the state did not turn over the evidence of Adam's interview to the defense. There is no declaration from defense counsel stating that the state failed to disclose this evidence. Second, the declaration purports to identify the state of the gun hours before the murder—but because Adam has not attested to the state of the gun immediately prior to the shooting—his declaration is

1 speculative and immaterial. There is no evidence that the gun was not touched or altered before
2 the shooting. There is, however, evidence that the victim had the gun in her possession before the
3 shooting, evidencing the possibility that the state of the gun was altered after Adam last saw it.
4 Finally, the evidence of guilt is overwhelming; Petitioner stated he pulled the trigger shooting the
5 victim and Adam testified to seeing Petitioner shoot the victim.

The state court found that even had the evidence established in Adam's declaration been withheld from Petitioner, that it carried no probative significance on the issue of Petitioner's guilt or punishment. ECF No. 1-1 at 8-9. The state court correctly determined that this evidence was neither contrary to nor based on an unreasonable application of clearly established federal law.

**B.  False Evidence**

A "conviction obtained through use of false evidence," known to be false by the state, or when the state "allows false evidence to go uncorrected" falls under the Fourteenth Amendment." Napue v. People of State of Ill., 360 U.S. 264, 269 (1959). The Court here finds that the state did not present false evidence regarding who cocked the gun. The state did not present evidence that Petitioner cocked the gun. It did infer in argument, however, that because Petitioner said he did not cock the gun and that the victim would have had trouble cocking the gun, that the person who cocked the gun was Petitioner. The trial court instructed the jury that closing arguments are not evidence, ECF No. 18-7 at 116, and the law presumes that the jury followed that instruction, see Cheney v. Washington, 614 F.3d 987, 997 (9th Cir. 2010). The new evidence from Adam's declaration does not demonstrate that the state knew that it was impossible for Petitioner to have cocked the gun.

The state court determined that there was no false evidence presented at trial. ECF No. 1-1 at 9. It found that the state presented evidence that it would have been difficult for the victim to cock the gun and Petitioner claimed he did not cock it—which is not false in juxtaposition with Adam's declaration. Id. Thus, this Court finds that the state court's determination was neither contrary to nor based on an unreasonable application of clearly established federal law.

9

1         **C.      *Trombetta/Youngblood* Motion**

2                In Trombetta, the Supreme Court held that when the government fails to preserve evidence, the right to due process is violated only if the evidence at issue possesses "an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. In Youngblood, the Supreme Court imposed the additional requirement that when "no more can be said than that [the evidence] could have been subjected to tests, the results of which might have exonerated the defendant," the defendant must demonstrate the government's bad faith in failing to preserve the potentially useful evidence. 488 U.S. at 67-68. Another configuration of this test is that a constitutional violation will be found if a showing is made that (1) the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, and (2) that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." United States v. Sivilla, 714 F.3d 1168, 1172 (9th Cir. 2013) (internal quotation marks omitted). Additionally, there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence. See Illinois v. Fisher, 540 U.S. 544, 547-48 (2004); Youngblood, 488 U.S. at 58; Sivilla, 714 F.3d at 1168; Villafuerte v. Stewart, 111 F.3d 616, 625 (9th Cir. 1997).

                Before trial, Petitioner moved to dismiss the case because he was not allowed to test the gun before it was cleaned. According to Petitioner's counsel at trial, the California Department of Justice evaluated the gun for fingerprints, blood, and tissue. ECF No. 18-1 at 129. The DNA on the gun was consistent with the victim's—the prints, however, were too smudged to make a meaningful comparison. Petitioner's counsel sought to conduct an independent evaluation of the gun but was unable to because the DOJ had wiped the gun clean prior to doing a test fire of the gun. The DOJ informed Petitioner's counsel that this was normal procedure. Id. at 130. Even assuming the state knew that Adam had cocked and loaded the gun the last time he saw it, Petitioner has not shown that the police acted in bad faith by destroying the forensic

evidence from the gun: the DOJ cleaned the gun prior to conducting a test fire as it was their "normal procedure," evidencing a lack of bad faith. Cf. United States v. Russo, No. 2:19-CR-0092-DB 1, 2020 WL 1057880, at *2 (E.D. Cal. Mar. 4, 2020) (noting a departure from normal procedures could be evidence of bad faith).

The state court determined that even if it were to consider the potentially excluded additional evidence related to the gun, that Adam's testimony was sufficient to establish Petitioner's crime. ECF No. 1-1 at 9-10. Thus, the Court finds that the state court's determination was neither contrary to nor based on an unreasonable application of clearly established federal law.

## VI.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 18, 2022

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE